Our next case is Pope v. Lunday, 20-6003. Mr. Gillette or Gillette. Miss. Pardon. Oh, they're too. They're. Oh, that's very unfortunate that you're that your name start with the same four letters. That's very hard on an old judge. I apologize. So, Miss. And your last name is pronounced how please Gillette. Miss Gillette. Okay, I apologize. Would you please proceed. Yes, your honors. May it please the court. My name is Carmen Gillette and I'm an attorney in Sarasota, Florida. I have the privilege of representing Kenneth Pope. I would also like to acknowledge my co counsel Laura McConnell Corbin and Elizabeth price in Oklahoma. Your honors, we're here today on an appeal of a Hague abduction proceeding. We are asking the panel to reverse the district court's order that was rendered on December 23rd of 2019. We believe that the order is replete with errors of law, which culminated in fundamental error of lack of due process and a failure to give Mr. Pope his his day in court, for lack of a better phrase. And I would like to concentrate first on those errors of law. The first error of law that we believe should be reversed, your honors, is the district courts, concluding that as a matter of law, an infant or a newborn child, as we have in the Pope case, could not let me let me jump in right there. I'm not sure it's fair to characterize the district court as ruling that an infant cannot have a habitual residence. I think that if you fairly read the district court's opinion, it says I've got some trouble wrapping my head around that. But even if a newborn can or must be assigned a place of habitual residence, these kids habitual residence isn't Brazil. So one of the problems I have with the briefing is sort of this straw man that we're going to say the district court did something when you fairly read the opinion. It didn't do that. So I'd like you to deal with the district court's actual analysis of habitual place of residence. Assuming that, yes, the district court made some stray comments about the concern about doing this for infants, but that's not ultimately what it did. All right, your honor, I apologize. I read the order to say that as a matter of law, infants and newborns could not have a habitual residence. But even if they could, it would not be Brazil because the district court actually, I don't know, had its own bright line presence test is how I read that. That it couldn't possibly be Brazil in that the children had never physically been present in Brazil. And we argued pre-Manaski, but certainly since the opinion articulated by Justice Ginsburg in Manaski, and actually some case law that has emanated recently, that physical presence is not a test for habitual residence for a newborn or otherwise. It may be one of the factors in the totality of the circumstances standard, but it certainly isn't a dispositive factor. And in this case, the court also, I think, conflated the issue of wrongful removal with wrongful retention. We specifically pled this case as a wrongful retention case at the moment of birth. The justice at the district court level seemed to focus on things that happened after the wrongful retention, things that happened subsequent to the birth of the twins in Oklahoma. But as you know, your honor, in a wrongful retention case, we don't look forward from the alleged date of retention. We can only look back. And looking back is actually symbolic looking back. And in this case, we would be asking to look back symbolically at the moment of birth. So he clearly, I believe from the opinion, did not conclude as a matter of law that infants cannot have a habitual residence. He concluded that there must be a physical presence test applied. And if they fail the physical presence test, they cannot be held to have habitual residence in the proposed country. Where do you read the language that you must have a physical? I mean, where do you read his language as saying that? Was he considered, I thought he considered generally the entire situation just like Monaski instructed him to do. Well, Monaski instructs that the judge consider a totality of the circumstances standard, which requires an evidentiary hearing. I mean, I don't see any authority that you have to have a hearing. You have to have a right to make a presentation, which occurred here. Well, we did make our presentation. We filed the petition, which was a sworn petition containing approximately 400 pieces of evidence. The response to the petition was unsworn and contained no evidence whatsoever. So I am not actually certain if this was treated as a sua sponte motion to dismiss the case or a sua sponte summary judgment in favor. What the district court did is the district court assumed for purposes of decision that all of the allegations in your petition were true. Correct. The district court in the order says that's what he did. But in fact, that's not what he did, because he actually did make some findings of fact without taking the evidence. Judge Avell, I'll get back to your question about where it is in the order in just a moment. For instance, the court made findings that the parties were estranged. There's no evidence attached to that petition that the parties were estranged. Well, isn't the lawsuit, the petition itself, and the fact that she was refusing to return to Brazil and refusing to bring the twins back pretty good evidence that they're estranged? Well, the question would be, when did that occur, though? And that's why we pled it as a wrongful retention at birth. There's nothing in this record at all that was in front of Judge Weirich that would support that these parties were estranged. In fact, quite the contrary. The evidence was that they were communicating the entire time. She remained wearing her wedding ring. She continued participating in the renovations of the marital home in Brazil. She's referring to Mr. Pope as her husband. There was nothing in this particular record before the court. If you call it a record, it was not actually proffered as evidence. But there's nothing in this record that would support that she was not going to return those children to raise them in Brazil. And that's the critical moment in time, and that's why we pled it the way we did. There's nothing up until the moment of birth that would have led Mr. Pope to any other conclusion that this woman was returning with those children to raise them as they had planned. How long had she been out of Brazil before the birth? She left Brazil on July 29th, and the birth of the twins was November 26th. When she left, was there any evidence in your affidavit material? Because the judge did say he was applying the evidence according to your statements. Was there anything in there about how long she represented she would be gone or why she represented she would be gone when she first left? Yes, sir. The evidence is that she purchased a round-trip ticket. She represented to Mr. Pope that she would be gone three to four weeks. She represented that she was attending a conference in Boston relating to her dental practice. She represented she was seeing her mother in Oklahoma and attending a bachelorette party on the West Coast and would be returning in approximately three to four weeks and, again, had a round-trip ticket to do that. They had lunch on the day she departed for the United States at their favorite restaurant, said their pleasantries. She had a small suitcase, and off she went. And that is all in the record. And, Judge, if I might ask you to look to page six of the district court's order, shortly above the last line, the very object of the convention, et cetera, et cetera. And a child can hardly be returned to a place the child has never been. Thus, while the term habitual residence is not defined by the convention, the text does provide valuable context as to the intended application of the term. And clearly — You take that statement, and I'm not saying it's right or wrong, but you take that statement as the reason for the decision? I think there are — I think the decision was based on several predicates, and one was that the suggestion that infants could not have a habitual residence. Second, moving to the next tier, even if they could, it could not possibly be in a place where they had not been physically present. But let's go to that second tier, because judges often — and I've read this. I've read the ruling, as I'm sure my colleagues have. I read it as kind of an alternative presentation by the judge. There are several different lines of reasoning that got the judge to where he came out. Right, but the case law in Minaski completely undermined the bright-line presence test. Right, so the first part might be wrong, but we've got that second alternative reading, which is putting aside the more unequivocal statements, didn't the court consider all the evidence? I don't know how it could, because we didn't have a trial. Well, you had the opportunity to present any evidence to the court you wanted by your affidavit, and the court considered every single thing you presented and said he took the evidence as you presented it. You didn't even make these findings, contrary to you. His finding was, I'm accepting everything that your client said. Well, and he ruled as a matter of law, but he also made findings that do contradict Mr. Pope's petition and his position in this case. Again, there was no evidence that this relationship was estranged. And the critical issue in this particular case is the issue of the wrongful retention. When did Mrs. Lunde communicate to Mr. Pope that she did not intend to return the children to Brazil? That's the critical issue. Let me ask you about inferences that might be drawn. If she says she's going to be gone three to four weeks and she stays significantly longer and does not contact him, isn't that a pretty good sign of something wrong with the relationship? The answer to that question might be yes, but the convention doesn't permit the court to make such inferences. The convention is based on rigid constructs, which this case is classic convention case. The convention is meant to restrict the court from looking to a person's evolving nature, which can rupture unilaterally a situation relating to the custody of the child, or in this case, the children. Evolving up to what point? If it's wrongful retention at the time of birth, by the time of birth, there's certainly evidence that the relationship was not good, that she didn't feel bound by any commitments made when she left Brazil. The reason for an evidentiary hearing is to get evidence. After you get evidence, you draw inferences. If you have any evidence that you're going to offer that the judge did not see, that's one thing. But you're complaining that with the evidence you presented, the judge drew inferences, and it's not clear what more you could have added as evidence at a hearing that would have changed the inferences the judge made from this. Well, the inferences relating to the relationship would not be dispositive of when Miss Lundy unequivocally communicated to Mr. Hope that she did not intend to return the children to Brazil for the purpose of raising them. The issue of whether perhaps she was unhappy in the marriage or became disenchanted with something along the way, or whether she chose to birth the children in Oklahoma as opposed to Brazil, is not dispositive of a wrongful retention case. Nothing is dispositive. It's a holistic approach. Correct. You're saying that the judge couldn't even consider evidence? That doesn't ring true. No, but the evidence in the petition is that at the first moment she communicated anything of this nature to Mr. Pope was at the moment of birth, shortly after the moment of birth, when he traveled to Oklahoma and visited her in the hospital. And he asked her, when is she coming home? And she said, I'm not coming home. And that's the moment in time that the wrongful retention occurred. It didn't occur before that. It occurred at that moment when he unequivocally knew, and there's witnesses that saw this. It's when it was unequivocally communicated to him that she had no intention of returning those children to Brazil to be raised, as had been the agreement between the married couple. That's the critical time, you say. And the question is, what was the infants, what were their habitual residences at that time? At the moment of birth of the twins. Wait, wait, wait, wait. But you just said that the wrongful retention was when she told him, I'm not taking them back. So if that's the moment of wrongful retention, isn't that also the moment when you determine an infant's habitual residence? Well, at this time, yes. And this occurred at the moment of birth. No? Well, OK, I'm a little confused there. Go ahead. Well, your time is up. I'll give you 30 seconds to complete your thought. Just that the moment of birth was the date of the alleged retention. And if you're looking at the habitual residence, you would be looking at the habitual residence of the children at the moment of the alleged retention or symbolically moments before, during the birth. So just to be clear, in response to Judge Hart's question, the violation, the wrongful retention was not when she told her husband, I'm not coming back home. It was the instant that they were born. Is that your statement of the moment when the wrongful retention occurred? No. The wrongful retention occurred when she unequivocally told Mr. Pope she would not return to Brazil, which was within hours of the birth of the twins. OK. All right. Thank you. Thank you, counsel. Mr. Guile, am I pronouncing your name correctly? That's correct, Your Honor. Go ahead. May it please the court. My name is Matt Guile and I represent Lauren Lunday in this matter. To briefly pick up where the court just left off on this issue of when the wrongful retention was alleged to have begun. With all respect to Miss Gillette, that's the first time I've heard that it was sometime after the moment of birth. And I certainly don't have the record memorized, but my recollection of the record, the petition, and the briefs on appeal was that the wrongful retention began at the moment of the birth of both of the children. Well, is your position that then the court can only look at the facts, that somehow Monanski says that you can only look at the facts at the moment of retention? Or is this totality of the circumstances broader than that? I do believe that it is much broader than that, Your Honor. In fact, I think the court did look at all of the circumstances in this case. And I understand the my opposition's point is that you can only look back and not forward. But I think the court looked at all the facts in this case. And that's why the district court did not commit clear error when it determined that based upon the allegations made by Mr. Pope that he could not meet his burden to prove that children who were born in the United States to parents who are United States citizens and had never been to Brazil were not habitually resident in Brazil at the moment of birth. Well, I don't know that it makes any difference in this case, but it might in precedent, depending on what is said in an opinion. But how long how long of a time gap was there between the moment of birth and the time that Mr. Pope was told that by Ms. Lundy that she was not going to return with the children? The record does not reflect that as my recollection that based on the presentation of my opposing counsel, it sounds like the allegation is sometime that day. However, the record also reflects that the parties have had a conversation back in September in which he alleged that my client had become angry with him, shouted at him, said that he could no longer call her his wife. And so I think the court could infer from that that there certainly his stated what Mr. Pope alleged was the purposes. The purpose of the trip from Brazil to the United States was no longer the case. Well, I'm not sure the fact that she said you can't consider me your wife really is is not dispositive if we accept as true the agreement that is pled or represented that they would the children will be raised in Brazil. But it probably doesn't matter, but it might in a future case so that our articulation of it might matter. Do you believe that the wrongful retention was the moment the children were born or the moment that she told Mr. Pope that she was not planning to bring the children back to Brazil? I'm not sure, Your Honor, I think in this case it would be the moment they were born because the evidence was clear that she had made that decision long before the children were born. So you think that a wrongful retention is measured by when the party in possession of the children subjectively makes a decision not to return, not when the party in retention discloses that to the other side. Here, there's very little time difference, but just in terms of precedent, it could be very significant in future cases. So I just want to know which of those two times you believe is the critical point of wrongful retention. Well, I believe, excuse me, Your Honor. No, I mean, I guess the other thing is we could look at when she first communicated the wrongful retention to her husband or when she first formed her own opinion not to return or when there's some other event that happened. So I'm just looking for your guidance more for future precedent than anything else as to when that moment of wrongful retention did. I don't want to take more of your time. Just state, and we'll worry about rationale, but just state the conclusion. When, what moment do you believe the wrongful retention occurred, or at least that we should consider as a matter of law to be the question of when the wrongful retention occurred, whether it was wrongful or not? When the subjective intent occurred, Your Honor, which in this case would be at the earliest possible moment would have been at the moment of birth of the children. Even if she had formed that opinion, that intent before the birth, maybe in labor, maybe she said, I'm not going to take these kids back. You say it could not be before the children were in fact born. I think that presents a difficult proposition based on the context of the convention applying to children. I'm just trying to avoid mucking up the future law any more than we're probably going to do anyhow. I understand, Your Honor. Let me go ahead and answer, and then I had a factual question. Our position would be that it would be when the subjective intent was formed. In this case, I think it presents a difficult proposition to say that the children were retained prior to their birth. Okay, proceed. Thank you. You said the record shows the conversation in September? Yes, Your Honor. Is that in her complaint? I don't believe that specific allegation was made in the complaint. It was contained in the 400-plus pages of materials that were attached to the petition, which under 22 USC section 9005 are deemed self-authenticating and admissible. Okay, so it was submitted by the plaintiff? That's correct, Your Honor. It was attached to the petition. I just wanted to see if there was some unfairness in the judge accepting that as true if the plaintiff was not accepting that fact. But that was actually in the materials she submitted. It was, Your Honor. It was reflected in the Brazilian lawsuit for support during the pregnancy. Those were the allegations. That was an ex parte order at that time that was reflected in those documents, Your Honor. It was ex parte because she was not involved in it. That's correct. She would not serve with that until after that point, Your Honor. Well, is it appropriate for us to consider that then? That was based upon the allegations that Mr. Pope made to the Brazilian court and then attached and would be incorporated by reference in his petition, Your Honor. So, yes. Do you think it's appropriate to apply that? I'm sorry. I got it backwards, yes. I want to make sure it's fair to him to include that because he submitted it. I'm sorry. Judge Ebel, did you have a question? No, no. Judge Hart's clarified that for me. Okay. Your Honor, I believe that in this case, Mr. Pope is making an argument that habitual residence determination hangs on an actual agreement. Like the mother in Manaski, in that case, the mother was arguing that an actual agreement was required for the habitual residence to be deemed Italy. In this case, Mr. Pope is arguing that an agreement was required for it to be any place besides Brazil. He's urging an analysis that's so focused on the shared parental intent that it's difficult to imagine a case in which a habitual residence finding would be different than the shared parental intent, at least as he frames the issue. But the Supreme Court in Manaski held that the habitual residence determination does not hang upon the existence of an agreement. In fact, the court has to look at a totality of the circumstances, which I believe that the court did in this case. It looked at the facts and circumstances that the children were born in the United States to United States citizens, that they had never spent any time in Brazil, and that there was an alleged agreement when the children were 19 to 20 weeks in utero, but that there was never a time during the lifetime of the children in which they had come to that. That's not to say that the agreement is not determinative, but it certainly is relevant, isn't it? Absolutely, Your Honor. It has to be considered. And that agreement was entered into when? I'm asking the question. This is a question. Was that agreement entered into when Mr. Pope knew that Ms. Lindy was pregnant? That is the allegation, Your Honor. Yes. Okay. And so I think I absolutely agree that the agreement, as alleged, would be relevant where I disagree with my opposition is the weight that that agreement should carry. The record also shows that my client left Brazil four months before the children were born and that the parties never saw each other from July 29 until November 27. She returned back to her home in Oklahoma, which is where the parties met, where they both attended undergraduate and graduate school, and that's where my client had worked. In fact, the record also reflects that's the only place she was licensed to work as a maxillofacial and oral surgeon. And I think it's important to look at the starting point in this case and that we look at the case law. A habitual residence finding in the absence of some level of physical presence is an exceedingly rare case. In fact, the case that was cited by the appellant is the Ouzo case from the Northern District of Illinois. That case presents very unusual circumstances, which are different from the ones that exist in this case. In that one, you had two Nigerian nationals who were living in England, and they had an unusual agreement in which the parents agreed the mother would travel to the United States in order to bestow upon children United States citizenship. And they actually followed through with that agreement with the older child. With respect to the second child, the mother in that case decided to stay in the United States, overstayed her tourist visa, and about a month after the child was born, the relationship between the parents deteriorated. Her asylum claim was ultimately denied, and the court found in that case, in the absence of physical presence from the younger child, that a habitual residence finding was appropriate. While that court looked at the habitual residence through the lens of shared parental intent, I think that case presents very different circumstances from here, where we both have parents who have ties to the United States, unlike the parties in Ouzo. If you look at what the court relied on, it's that the babies were born in the United States to parents who were both United States citizens. And that since their birth, they hadn't spent any time in Brazil. And that since their birth, the parents hadn't made a decision as to where they would be raised. If that's all it takes, doesn't that encourage people to move to, if they have a disagreement with their spouse, move somewhere else, and have the children there, and say, I've now decided this is my habitual place of residence? I mean, it doesn't take much, does it, to create a habitual place of residence? Well, at least not have the habitual place of residence be where the marriage was, where the marriage was consummated, and where the children were conceived. I understand the court's point, and would agree that in some cases that might be true. I don't believe that is this case, because of the ties that both parties had to the United States. If the case, well, of course, every case is different from the other in the wake of Banaski, but I think each case is different. And if this, if my client had traveled to some country in which neither party had any ties or any history or any ability to work in or a previous home, then the case would be different. And in that case, the result would probably be different as well. So you believe we can look to the parents' historic ties to determine the child's habitual place of residence? I believe that it makes a difference between just picking a random country that neither party had ever been to or had a tie to, and the case here where both parties were from the state of Oklahoma. Well, and doesn't Banaski say when we have very young children, we do look to the caretaker's ties? It does, Your Honor. That's exactly the language from Banaski. And in this case, I think the next point is that the court did not abuse its discretion in making this determination without holding a hearing. This court's precedent in West v. DeBrev answers that question about whether due process would be denied as a matter of law, that there's nothing in the convention or in the due process clause of the Fifth Amendment that would require a hearing, an evidentiary hearing in every case. The court has to balance the due process rights of the parties against the requirement that it act expeditiously in resolving these disputes. And in this case, Mr. Pope has not pointed to any additional evidence that he should have been able to present. He just says that from his brief, the statement was, Pope was and remains entitled to a hearing to present evidence concerning the last shared intent of the parties to establish the children's habitual residence, to which the district court would then apply appropriate convention law. So, again, he's urging an analysis based on shared intent. For these reasons, we'd ask that the judgment of the district court be affirmed. Thank you, counsel. Any further questions from the panel? No. Case is submitted.